So in the interest of time, I'm going to dispense with reading the calendar this morning. The first case is SAFRA Securities v. Gonzalez, and we are ready to proceed. May it please the court, Aaron Marks for the appellant, SAFRA Entities. The district court committed error when it deferred to the FINRA panel of arbitrators on the question of arbitrability and dismissed this action. This action was initiated in order to seek to enjoin the FINRA arbitration that Ms. Spinola-Gonzalez had commenced against SAFRA Securities LLC. It has long been the law of this circuit that in the absence of an agreement to submit the matter of arbitrability to the arbitrators, the question of whether or not a dispute is arbitrable is one for the court. Let's assume that you are right and that the district court erred in saying that the question of arbitrability is for the arbitrators, unless there's an agreement. But why isn't this an agreement to arbitrate, perhaps even an agreement to have the arbitrator decide whether it is, but at the very least, a direct agreement to arbitrate? Thank you, Judge. Even though the district court did not address the issue of whether there was an agreement, we believe there was no such agreement here and certainly not an agreement that reflected that there was clear and unmistakable intent on the part of SAFRA Securities to submit the issue of arbitrability to the arbitrators. The agreement doesn't specify that point. I agree with you there. But it is a broad agreement to arbitrate and it was entered into by your client and then your client moved in the arbitration to have the case dismissed. Once your client made that choice to actually affirmatively ask the arbitrator to rule on this question, why isn't your position waived? So two separate questions there, Judge Walker. First of all, with respect to the agreement that you referenced, the complaint that was filed, you know, lays out, this is now page A9 of the appendix, makes clear that there was not intent on the part of SAFRA Securities to submit the issue of arbitrability. The complaint details how SAFRA Securities in the first instance, on March 7th, filed with FINRA a modified version of the agreement. But that was turned down and then you signed this one. So what does it matter that you, yeah, I have the modified version. There's no doubt that you would have preferred something else, but then you signed this one. Understood, Your Honor. But what... Let me focus on this one. This agreement to arbitrate, after the second one. Yes, Your Honor. The agreement to arbitrate certainly, you know, while it does not speak to the issue of arbitrability per se, there's no question that there was an agreement signed. However, as the complaint lays out, you know, this was really a coerced, you know, signing of the agreement. The complaint pleads that the FINRA case administrator... That's what you say, but you could have sought, gone to court and gotten an injunction rather than signing. But you chose to sign. And, you know, this isn't the case of a pro se or something where we might try, but I don't know if we even could with a pro se. You chose to sign. Yeah. But you could have taken other action. Yeah. And, Your Honor, we agree that that's precisely what happened. And, yes, if we go back in time, it would have been cleaner to do it, you know, the way that you suggest. It might be outcome determinative. Well, Your Honor, I mean, again, we would point to the language that this Court, you know, that this Court used in both the Bensadun case and Wachovia that, you know, that really that there needs to be clear and unmistakable intent of SAFRA securities to submit the issue of arbitrability to the arbitrators. It is a submission agreement, and it does, I know it doesn't have explicit language. It doesn't say this is a clear and unmistakable agreement to submit the question of arbitrability. But that's almost all that it doesn't have. I mean, the entire present matter is submitted. Your Honor, I don't disagree that on the face of the contract itself, we have a real uphill battle here. But what we would — what we urge is that what the district court had before it was our complaint, and the complaint laid out a story, right, as to how that agreement came about. And we believe that that story, if the court had explored it, would find that there was not clear intent. In fact — Even accepting all of that, after the agreement was signed, the second agreement was signed, the issue of arbitrability was litigated before the arbitrator. You made a motion before the arbitrator. So if there was any ambiguity or doubt about the intent to have the arbitrator decide it, when you went ahead and brought a motion before the arbitrator, it seems to me that that answers that question. And in any event, it's a waiver. Yeah. So, Your Honor, there are actually two separate motions that are referenced in the record. The first one was made not to the arbitrators, but to the FINRA dispute resolution administrative body. And that was made even before the — before the submission agreement was signed.  So your point is that the submission agreement, the second one, that was signed, and then there was a motion, but that motion wasn't to the arbitrator himself. That was to the — some official there at FINRA. Yeah. I'm sorry if I'm not being clear. Be clear. Yeah. The motion — the motion to the administrator was filed before any submission agreement was signed and rejected by the administrator.  Okay. Then — then the submission agreement episode occurred. Then an action was brought before Judge Stanton. Judge Stanton dismissed the action, directed us to FINRA, and then there was a motion filed before FINRA. At that point, we had no choice, right, but to file a motion before FINRA or otherwise, you know, depending on how this would come out — If you had a choice, you could have asked Judge Stanton to stay as an order pending appeal. Then you could have appealed his decision. That was a choice. Agreed. Agreed. We could have done that. Let's go back. I just want to be clear in what your argument is. You are saying that it is a plausible complaint where somebody has signed an agreement to arbitrate, that the agreement was made — was compelled, where the only evidence of compulsion was what is stated here, and you could have brought an action to keep from being made to sign. Now, you're saying that despite that, that fact is enough to raise a plausible argument. That's your argument. So the evidence for that, which was never developed — No, that — again, we're talking about what is a plausible argument on a complaint, and you're saying there is an agreement that on its face would say we agree to arbitrate. We say that it was compelled, but in circumstances where you admit that you could have brought some action in court rather than signing, but you say other things might indicate that that's enough to compel, even though those other things are not stated in the complaint. That's correct, Your Honor. That's our position. Just so that I have it right. Your position, I take it, would be that if there was — forget an agreement having been the result of this particular litigation, but if there was just a standard agreement to arbitrate, that the question of the arbitrability of the question would not be — would still be one for the court rather than one for the arbitrator. Yeah, I think the case law from the circuit is pretty clear on that. Yeah. So this is kind of an exception to that rule, where you better — if there is an exception. I'm not coming to that, but the other side would argue that this would be an exception to that rule. I'm not sure you call it an exception, but we're just saying that there was not an agreement to arbitrate because it was coerced. These are unusual circumstances. There's no doubt about it. We agree. Okay. Thank you. Thank you. Good morning, Your Honors. I think the discussion here has hit it on the head. There are two separate grounds, but the primary ground is that software securities voluntarily signed the submission agreement that stated that anything in the claim, the answer, any counterclaim would be submitted to the arbitrators to decide respondent's position that there needs to be a second level test after that to determine whether or not defendant is also a customer. There are no cases that I don't believe has been cited by either party to suggest this multi-step process where first you get an agreement, which FINRA in notice to members 04-11 stated the purpose of that agreement was to preclude collateral attack. That's why they make the party sign this, that that would be just the first step in a larger analysis. I can agree, though, that if there had been an original, before all of this, there had been an agreement to arbitrate all the claims arising out of this relationship, that still the question of whether the particular lawsuit, the particular action was within that clause, was within those terms, would have been a question for the court. Is your question, if the agreement was not signed, then? No, there was an agreement. I'm not talking about this agreement. Forget this case. This is hypothetical. Sure. Parties have an agreement to arbitrate, a general agreement to arbitrate, and it purports to cover all of the merits of any dispute they have. And then the question is, is the particular action one of those disputes that's covered, that particular question, its arbitrability, would be a question for the court under our normal precedence. Right. In any context, a party can always go to court and say there are always two issues. You concede that the district court erred in saying that the question of arbitrability is a question for the court in the first instance, because you won below on the basis of that finding by the district court. That doesn't mean we can't affirm the district court on other grounds, but the ground on which the district court found you concede was erroneous. No. The district court order says that Ms. Spinola was Ms. Trauer's customer and FINRA can have jurisdiction. He ruled on the 12-200 ground. He didn't really address the arbitration agreement. But going back, my point was that any person, whatever the contract is, can always say, I don't have a contract, or it's not within the scope. It's always the right, whether or not that that is a plausible argument, right, because if you have a signed document, you're probably not going to win the existence argument. And then you have the scope argument, which has the Supreme Court analysis of, you know, can it be said without positive assurance that it doesn't fall within the scope language. You have that argument. So every person always has those arguments. It just turns on the facts. If he had gone to court instead of signing the submission agreement and said, there's no customer broker relationship here. This shouldn't be sent to the arbitration. There would be a determination by the court as to whether it fell within the scope of Rule 12-200. Is that how it would work? That's correct. And that's the typical process that most brokerage firms go through. And every case with the exception of the first Montauk, the Smith v. Bartoli, and the Morgan-Keegan v. Guerra cases, which involve the submission agreement, every other case I believe cited by the parties doesn't have such a document. You're saying that, as I understand Petitioner's argument, Pellant's argument, it is that this agreement to arbitrate is not a valid agreement because it was coerced and that their statement that it was coerced is enough to raise a question that gets us by the dismissal stage and that we should have allowed further inquiry into whether the agreement was coerced. Now, if the district court was correct on finding that there's a customer relationship, then it doesn't matter. But that's one hell of a mess, that whole question. It's just, you know, it's not an easy question. The easy question is whether there was an agreement to arbitrate or not. So what do you say to their argument about whether this was coerced, that there's enough in their complaint so that it leaves a question of coercion for further inquiry? Sure. I mean, there are plenty of cases where you could have an 80-year-old person open up a credit card account and it contains a class action waiver in the arbitration agreement and that would be upheld. But here we have a sophisticated broker-dealer on the advice of counsel signing a document. And if that's coercion, I don't see it in the case law that I've reviewed and I don't believe either party has submitted that. You're saying that if we said this, then any time anybody signs a document and says it was coerced, that very statement is enough to get us beyond 12b-6? Right. Would the Court like me to address the 12-200 ground? Sure. So, you know, I think Respondent's principal case that they rely on is the Wachovia case. And there's also a companion case that appears a same-name party, this VCG, which was a hedge fund. And Respondent cites those cases for the proposition that any time a bank is involved, then the case is not arbitrable. But what those cases held was that in that context, there were maybe a dozen persons working with this hedge fund. And those persons, if they worked at the brokerage firm, the brokerage firm was hired by the bank. The bank was the principal. The brokerage firm was acting as an agent for the bank to help and assist in the structuring of that deal. The brokerage firm was not in a sort of principal-agency-customer relationship with the hedge fund itself. The hedge fund talked to the brokerage firm, but the brokerage firm was always serving the interests of another master. And that's just not what happened in this case. There's only one person, Ms. Trower, and she was always defendant's broker advisor. So these cases are not analogous. There are other authorities in the Second Circuit. But the relationship here, the account was with a non-FINRA member. Do you agree with that? That is correct. And FINRA has rules that state that when you engage in securities-related conduct, that conduct, if you're registered and licensed, has to be supervised by the brokerage firm. It doesn't matter that you could legally conduct this activity through another entity. It's the fact that you are registered. So Software Securities could have avoided this, right, by structuring its business differently. It could have required all of its brokers to open up accounts at Software Securities and all its bankers to open up securities accounts at the bank, and then there would be no overlap. But here, they had people with both hats, and that provides the sort of overlapping supervision that we see here. And the bank employee. Yes, both. And the conduct here, didn't much of it involve, maybe all of it involve, access to and use of the bank account? Correct. As opposed to the trading and securities. No, it was a securities trading account at a bank. There were hundreds of thousands of dollars in Apple stock and options that were traded. It was a securities account. So that is a, it's not a deposit account that would just implicate, you know, bank rules. There's a securities component here that is the core business of a broker-dealer. That is enough to invoke the rule. Correct. That's our position. This is a fairly strong argument. On the other hand, if we were to find that there is an agreement to arbitrate, then any correct. Okay. My question is whether the agreement to arbitrate covers an agreement to arbitrate the question of arbitrability. And I, my understanding is that the cases of, on that score are, that require that there  am I, am I correct in that or not? That is my understanding as well. FINRA does have its own rule that is, it's not the same as 12-200. It's 12-504, which has a sort of jurisdictional limitation component to it, which respondent did allude to in the underlying case. But it is also my understanding that unless the agreement specifically intends to forward the question of arbitrability, that remains with the court. But again, why do we need to decide that if there is a clear enough agreement to arbitrate so that we as a court can decide that there is an agreement to arbitrate? Then we don't need to send the question of arbitrability to an arbitrator, which we would only, we would do unless there were agreement, agreement. Right. It's a contract. And so that prong should be satisfied. The only second prong is the scope argument. And clearly the agreement itself says you're going to submit the answer, the complaint and the issues raised therein to arbitration. So that's the scope. This is a wonderfully complicated case, which may be easy. Thank you. Thank you. Recognize that the coercion argument that we're making here is messy. That said, you know, the unexplored record on it, you know, which is set forth in the complaint is actually fairly clear in that there was a modified agreement submitted by you know, basically a threat from the case administrator that if you don't give us, you know, an agreement that is not modified, you know, you're going to have sanctions essentially against your client. And then, you know, the lawyer for Safra Securities did just that. As to the 12-200 argument, we disagree that the district court reached the issue of arbitrability and deferred on that issue to the arbitrators. And that's reflected in both the transcript and the order. If this court were to reach the issue of arbitrability, we think actually it's fairly clear. In ABAR, the court, this court provided a bright line definition for the term customer under FINRA rules. And it is either one who purchases a good or service from a FINRA member or has an account with a FINRA member. Here it's undisputed that Ms. Spinola-Gonzalez did not purchase a good or service from Safra Securities. The only, you know, the only Apple options buying was from Safra National Bank, not from Safra Securities. And it's also undisputed that Ms. Spinola-Gonzalez did not have an account with Safra Securities. We also believe that it's beyond dispute that Ms. Spinola-Gonzalez was not a customer of Ms. Trower, the registered representative. Ms. Trower was employed as an account officer of Safra National Bank, where Ms. Spinola-Gonzalez and her husband had an account. Accordingly, Ms. Spinola-Gonzalez was a customer of Safra National Bank. She was not a customer of Ms. Trower's. This is different from the situation that this Court faced in John Hancock, where the investors were the clients or customers there of Mr. Fusillo, who was acting as an independent contractor and was directly selling securities to investors. So, accordingly, we believe that if this Court reached that issue, it's either a very straightforward issue of that this is not an arbitrable issue, or it could be remanded back to Judge Stanton for findings. Thank you. Thank you. Thank you both. You're all argued.